IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JACKSON HARMON ENTERPRISES, LLC, d/b/a MIDWEST TOWING, A Nebraska Limited Liability Company, <br><br> Plaintiff, <br><br> v. <br><br> INSURANCE AUTO AUCTIONS, INC., An Illinois Corporation, <br><br> Defendant. | 8:13CV3194 <br><br> **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

This is a diversity action alleging breach of contract and, alternatively, unjust enrichment[1] arising from the defendant's failure to pay the plaintiff for what the parties and witnesses have variously referred to as "two-stop," "second-stop," "added-stop," or "additional-stop" towing services. After a three-day non-jury trial, the following constitutes the court's Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a)(1).

## I. FINDINGS OF FACT

1. Defendant Insurance Auto Auctions ("IAA") is an Illinois corporation engaged in the business of storing automobiles in Douglas County, Nebraska. IAA provides a forum for insurance companies and other vehicle providers to dispose of

---

[1]The plaintiff's unjust enrichment claim was dismissed during the non-jury trial in this matter because there is no factual dispute that the plaintiff's claims are governed by the parties' contract. *First Express Services Group, Inc. v. Easter*, 840 N.W.2d 465, 476 (Neb. 2013) ("liability under a contract displaces liability under an unjust enrichment theory"). (Filing 139, Audio File of Trial 3:56:01.)

total-loss, theft-recovered, or dealer trade-in vehicles at auction. Upon assignment from a provider, IAA utilizes towers like plaintiff Midwest Towing ("Midwest") to pick up and deliver vehicles that are assigned to IAA by various vehicle providers.

2. Prior to March 8, 2010, and until January 21, 2013, IAA's Omaha branch operated out of offices located at 4506 S. 52nd Street, in Omaha, Nebraska. Prior to March 8, 2010, and until December 4 or 5, 2012, the Omaha branch consisted of three lots. The main lot, where auctions occurred, was the 52nd Street location, and two other lots were located at 4710 S. 36th Street and at or near 60th and L Streets in Omaha (the "52nd Street," "36th Street," and "60th Street" lots).

### Contract Negotiations

3. In order to solicit bids for towing of light-duty salvage vehicles, IAA invited towers to participate in a Request for Proposal ("RFP") process beginning in January 2010. IAA utilized Ryder Logistics to coordinate the RFP process. On January 24, 2010, Midwest General Manager Jeff Jackson signed an acknowledgment of "Tower Instructions and Bidder Requirements," as listed in the RFP.

4. On January 24, 2010, Midwest faxed to Ryder Logistics its "Responses to Request for Proposal: IAA Omaha." In Midwest's responses to RFP 4.14, Midwest stated in pertinent part: "Not covered fees will include: . . . Wait time, dry runs or double pick ups. We realize that most of these are addressed in the contract and so feel that as long as any additional fees are approved by the Omaha branch manager, they will be paid but, if they are not approved prior to performance they can and may be denied." (Trial Ex. 115.)

5. On January 26, 2010, Midwest Towing sent a fax to Rashell Lang of Ryder Logistics with its proposal for towing services. This fax included proposed Towing Rate Sheets signed by Jeff Jackson with handwritten proposed base towing rates for 20 tow zones and "Remote Drop Yard Transfer Tows." The proposed

2

Towing Rate Sheets included a provision titled "Additional Charges," which provided in pertinent part:

> **Additional Charges**
> 1) Dry Runs –
>> >Will be paid at 35% of the applicable zone rate. Dry runs must be pre-approved by Branch Manager.
> 2) Wait time –
>> >IAA will not pay for wait time for the first ½ hour. After 30 minutes, wait time will be paid at $25.00 per ½ hour increments, if approved by the Branch Manager.
> 3) Added Stops –
>> >IAA will pay $25.00 for additional stops, if approved by the Branch Manager.

(Trial Exs. 109, 110, 112, 113.)

6. The January 26, 2010, fax also included a list of typewritten questions and Jeff Jackson's handwritten responses. Jackson's responses indicated that Midwest read and understood the terms, requirements, and conditions of the proposed contracts and service level agreement and that Midwest was able to handle seasonal spikes, which typically occurred in the winter months and might include the need for additional equipment. (Trial Ex. 111.)

7. In February of 2010, Jeff Jackson visited IAA Branch Manager John Williams at the 52nd Street lot. During this visit, Williams and Jackson toured all of the lots operated by the Omaha branch, including the 36th and 60th Street lots.

8. Ultimately, IAA conducted a final meeting with Midwest and other towers that submitted bids, and IAA selected Midwest for the light-duty towing contract.

9. Before Jackson entered into the contract with IAA, Jackson was aware of IAA's 36th, 52nd, and 60th Street lots, and knew that Midwest might be required to

make deliveries to lots other than the IAA branch office at 52nd Street. However, Jackson understood that these deliveries would be for "overflow" only, and such deliveries would not be a daily requirement. Jackson also understood that no matter where the vehicles were towed, the paperwork associated with the tow must be delivered to the 52nd Street branch office immediately after the tow.

10. During the contract negotiation process, no one told Jackson that Midwest would be paid for second-stop fees for deliveries to outlying lots.

**Contract Language**

11. On March 8, 2010, Midwest and IAA entered into a Towing Services Agreement ("TSA"), pursuant to which Midwest agreed to pick up motor vehicles and trailers throughout the State of Nebraska. The TSA was an IAA form contract that IAA drafted. The parties did not negotiate over the terms of the TSA, other than the price that Midwest would charge for its towing services. Midwest did not have a lawyer review the contract before signing it and did not consult with a lawyer concerning the contract at any time prior to signing it.

12. The TSA stated at ¶ 4.2 that "[a]ll additional charges such as two stops, waiting time, and dry runs not authorized by IAA will be absorbed by [Midwest] and not reimbursed by IAA." The TSA expressly stated at ¶ 14 that it "fully incorporates any and all terms, conditions, rights, obligations, covenants, promises of the like of the attached RFP," and that "this agreement and the attached RFP constitute binding obligations on both parties, which may only be modified or amended in writing duly signed by both parties." (Trial Ex. 101.)

13. Paragraph 13 of the TSA provided that either party may terminate the agreement upon 30 days written notice of nonperformance, giving the other party 15 days to cure the alleged nonperformance. Paragraph 13 also provided that Midwest may terminate the contract, with or without cause, upon 90 days written notice and

IAA may terminate the contract, with or without cause, upon 30 days prior written notice to Midwest. (Trial Ex. 101.)

14. The TSA also included a Towing Rate Sheet signed by Jeff Jackson which listed base towing rates for 20 tow zones and "Remote Drop Yard Transfer Tows." (Trial Ex. 103.) Under this Rate Sheet, Midwest was paid base towing rates of $42.00 for vehicles picked up between 0 and 10 miles from the Omaha 52nd Street branch, $50.00 for vehicles picked up between 11 and 20 miles from the Omaha branch, and up to $355.00 plus $1.00 per mile for vehicles picked up over 361 miles from the Omaha branch. The rate sheet further provided that Midwest Towing was to be paid $20.00 for transferring vehicles between IAA's lots ("Remote Drop Yard Transfer Tows"). The Towing Rate Sheet also included the same "Additional Charges" provisions quoted above in paragraph 5 of these Findings of Fact, as well as a notation that "Tow Zones consist of radius miles from the branch location," which was the 52nd Street lot.[2]

15. IAA and Midwest also executed an "IAA/Tower Service Level Agreement" ("SLA"), which was effective March 8, 2010. The SLA provided in pertinent part that "**All additional Tower charges** such as multiple stops, waiting time, dry runs, etc. not previously authorized by IAA will be absorbed by Tower." The SLA also provided "Tower Procedures," including the requirement that "[t]he completed Tow Bill and shop receipt are brought to IAA Office." (Trial Ex. 102.)

---

[2]The parties amended the rate sheet effective October 1, 2012. The amended Towing Rate Sheet reduced towing rates from all tow zones by $3.00, deleted the $20.00 charge for Remote Drop Yard Transfer Tows, and stated that "Tow Zones consist of shortest times (practical driven miles) from pick-up location to the branch location." The amended Towing Rate Sheet retained the "Additional Charges" language from the prior Rate Sheet. (Trial Ex. 104.) Again, Midwest did not have a lawyer review the amended Rate Sheet or the parties' contract before signing them.

5

**Performance of the Contract**

16. On March 8, 2010, IAA trained two Midwest employees on the "release, dispatch, and log-in" function—that is, how to document completion of towing services, both electronically and on paper, in IAA's system. Midwest understood that it was to have an employee in the IAA 52nd Street branch office to perform this function during the term of the contract because Midwest would need to answer calls from insurance adjusters and would need to log in vehicles immediately when they arrived at the 52nd Street lot so adjusters could quickly come to the lot to inspect the cars. As a result of this training, Midwest also understood that immediately after a tow was completed at any IAA lot, Midwest must physically bring the original paperwork documenting the towing service (the "tow bills") to IAA's 52nd Street branch office. Submission of the paperwork was necessary in order for Midwest to be paid the following day.

17. On March 15, 2010, Jeff Jackson and John Williams signed the "IAA Implementation Checklist." (Trial Ex. 116.) The Implementation Checklist stated in pertinent part:

> 1. Tower has reviewed and understands Service Level Agreement (SLA)?
> 2. Tower understands policy on unauthorized charges (wait time, dry run charges, etc.)?
> …
> 6. Tower has read and understands Tower Procedures noted in SLA and/or Towing Services Agreement?
> …
> 8. Tower understands zone pricing?
> 9. Tower understands drop-off procedures, staging area and paperwork requirements?

18. Every item on the Implementation Checklist was "checked."

19. On or about June 29, 2010, IAA requested Midwest to deliver all State Farm insured vehicles to the 36th Street lot. On or about January 24, 2011, IAA requested Midwest to deliver all State Farm insured vehicles to the 60th Street lot. Midwest delivered all State Farm vehicles to the 60th Street lot until approximately December 5, 2012. The IAA Branch Manager also requested Midwest to deliver vehicles to either the 36th Street lot or the 60th Street lot from time to time to prevent overloading the storage lot at the 52th Street location until approximately December 5, 2012, when IAA moved their office to Springfield, Nebraska.$^{3}$

20. From March 8, 2010, until early 2011, Midwest never protested or complained to IAA regarding the delivery of vehicles to lots other than the 52nd Street lot.

21. The first time Midwest requested payment from IAA for deliveries to outlying lots was in early 2011. Midwest's manager, Jeff Jackson, told IAA's branch manager, John Williams, that "the change of having to drop cars all over off the same load is starting to really cost me money," and he asked, "will IAA do anything about the fact that we're having do this?" Williams responded that IAA's area manager, Dawn Kors, would not approve additional payments and that he could not approve additional payment either.

22. Jackson again approached Williams in mid-2011, and Williams again responded that he could not approve payment of additional compensation. Williams suggested that Jackson check with the IAA Transportation Department concerning his request for additional compensation. Jackson also spoke directly with Dawn Kors in October 2011, and she told him the additional compensation Midwest was requesting

---

$^{3}$Plaintiff does not challenge IAA's actions after the move to Springfield, Nebraska. After the move, Midwest was allowed to communicate tow bill information by telephone, so paperwork did not have to be physically delivered to IAA's branch office.

was "not in the budget." She offered to put the Towing Services Agreement back up for a request for proposal, but Midwest did not make such a request because it did not want to lose the contract. Midwest continued to provide towing services to IAA under the Towing Services Agreement through July 26, 2013.

23.     In response to John Williams's suggestion that Midwest contact the IAA Transportation Department about extra compensation, on November 4, 2011, Jeff Jackson called IAA Transportation Manager Greg Santilli. In that telephone conversation, Jackson told Santilli that he was delivering to multiple lots, that he was unloading and reloading cars, and that he was required to take the paperwork back to the IAA office at the 52nd Street location after towing to outlying IAA lots. Jackson told Santilli about his unsuccessful extra compensation requests from IAA Branch Manager John Williams and Dawn Kors. In response, Santilli asked Jackson whether he was getting "second-stop fees" for deliveries to outlying lots.

24.     Relying on Santilli's statement, Jackson repeatedly made requests of IAA personnel for second-stop fees under the contract for deliveries to IAA's 36th and 60th Street lots. On September 28, 2012, Jackson met with IAA officials in Cincinnati, Ohio, to discuss Midwest's request for added-stop fees for deliveries made to outlying lots. After that meeting, Jackson provided to IAA voluminous documentation that purported to represent Midwest's unpaid "second stops."

25.     Jackson received an e-mail from IAA Transportation Manager Kent Morrison on March 1, 2013, stating that "IAA is reviewing the 2nd stop scenario," leading Jackson to believe that the matter would eventually be resolved.

### Parties' Understanding of Second Stops

26.     From its experience with the salvage towing industry, IAA understands that a "second stop" warranting approval of an additional two-stop charge only occurs incident to the pickup of a vehicle by the tower, not during the course of its delivery

to IAA's lot. For example, a "second stop" occurs when a driver pays impound fees at a courthouse or sheriff's office and then picks up the vehicle at a second location. Such "second stops" are rare, typically occurring once every three weeks.

27.   Midwest understands that the terms "two stops," "extra stops," and "additional stops" all mean the same thing in the towing industry, and that such stops occur any time a tower must stop somewhere other than the pickup and delivery points.

28.   For approximately the first year of providing towing services to IAA pursuant to the contract, Midwest did not believe that deliveries to multiple lots from a single load entitled it to any charges or compensation in addition to the base towing rates in the original and amended Towing Rate Sheets.

29.   Midwest trained its drivers to request approval for two-stop charges and to advise Midwest's dispatcher via telephone or text once the driver recognized a second stop would be required. When Midwest's dispatcher determined that a request for approval of a two-stop charge was necessary, it asked the IAA branch manager for approval. If Midwest's dispatcher could not reach the branch manager before the towing service was performed, Midwest performed the service and then understood that it was required to make a post-performance request for approval of the charge.

30.   Midwest typically submitted a $25 "green and white invoice" for two-stop charges that were approved by IAA branch management. Midwest included these invoices on the daily spreadsheet it submitted to IAA for payment the next day. Midwest admits that, for the tows at issue in this litigation, it did not invoice IAA for two-stop charges through the customary and daily process; there was no written note of approval in IAA's system for the tows at issue; and Midwest did not give IAA any other contemporaneous writing evidencing the second stops alleged in this case. Midwest eventually provided IAA a list of the stock numbers for vehicles for which

9

it claimed "two-stop" charges were payable, but not until September 2012, at which time a partial list was provided.

31.    The Omaha IAA branch never denied payment of a two-stop charge when properly requested by Midwest and approved by IAA.

### Termination of Contract

32.    Midwest sent a purported notice of termination of the contract to IAA on February 18, 2013, because IAA was not responding to a renewal of the towing rate schedule and to Jackson's requests for second-stop fees. Less than a month later, rates were increased and IAA communicated to Jackson that it was considering the second-stop situation. (Trial Ex. 25.) As a result, Jackson did not pursue termination of the contract, he withdrew the notice of termination "verbally," and he understood that the contract would be renewed for another year.

33.    Pursuant to ¶ 13 of the TSA, Midwest never provided IAA with written notice of nonperformance and an opportunity to cure, nor did it provide 90 days written notice of termination.

34.    IAA provided Midwest with 30 days written notice of termination. On June 28, 2013, IAA provided written notification to Midwest that the contract would terminate effective July 27, 2013. The notice was e-mailed to and received by Jeff Jackson on June 28, 2013. Midwest continued to provide towing services through July 26, 2013, and provided its last tow under the parties' contract on July 26, 2013. (Filing 120, Order on Final Pretrial Conf. at CM/ECF p. 3.)

### II. CONCLUSIONS OF LAW

Midwest claims that IAA breached the parties' contract by failing to pay Midwest $243,225.00, which is comprised of a $25.00 additional stop charge on each

of 9,729 tows for which IAA required that Midwest (1) deliver the towed vehicles to an "outlying lot" (a lot other than IAA's 52nd Street branch office) and (2) hand-deliver the tow bills and shop receipts for the towed vehicles to IAA's 52nd Street branch office immediately after delivery of the vehicles to an outlying lot.

"In order to recover in an action for breach of contract, the plaintiff must plead and prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that activate the defendant's duty." *Phipps v. Skyview Farms, Inc.*, 610 N.W.2d 723, 730 (Neb. 2000). A "breach" is the nonperformance of a contractual duty. *Id*. Here, the parties do not dispute that a valid contract exists. The issue is whether IAA breached the contract when it failed to pay for what Midwest Towing alleges are "second stops." In order to determine whether a breach of contract occurred, I must first construe the contractual language that I previously found to be ambiguous.

## Construction of Contract and Breach

Midwest argues that because the IAA branch manager requested delivery of 9,729 tows to outlying lots, and because IAA's approval of those added stops was implicit in those requests, IAA owes the added-stop charge for the tows at issue. (Filing 128, Pl.'s Tr. Br. at CM/ECF p. 25.) IAA maintains that the contract required IAA branch management to approve payment of all additional charges, and such approval was never requested or given for any of the tows in dispute. (Filing 127, Def.'s Tr. Br. at CM/ECF p. 5.)

I previously determined that ¶ 4.2 of the Towing Services Agreement and the "Added Stops" language in the "Additional Charges" section of the Towing Rate Sheet are ambiguous. (Filing 117.) Accordingly, I must glean the parties' intent and understanding of these provisions based upon the extrinsic evidence presented at trial. (*See* Filing 117 ("A written instrument is open to explanation by parol evidence when its terms are susceptible to two constructions or where the language employed is

vague or ambiguous") (citing *Davenport Ltd. Partnership v. 75th & Dodge I, L.P., 780 N.W.2d 416, 423 (Neb. 2010)*).) When a contract is ambiguous, the court may consider all facts and circumstances leading up to the contract's execution, the nature and situation of the subject matter, and the apparent purpose of the contract. *Nebraska Depository Inst. Guar. Corp. v. Stastny, 243 Neb. 36, 497 N.W.2d 657 (1993)*.

A contract must be interpreted to give effect to the parties' intent at the time the contract was made. *Nebraska Pub. Power Dist. v. MidAmerican Energy Co., 234 F.3d 1032, 1044 (8th Cir. 2000)* (citing *Kast v. American-Amicable Life Ins. Co., 559 N.W.2d 460, 464 (Neb. 1997)*). "'It is well-established law in this state that the interpretation given to a contract by the parties themselves while engaged in the performance of it is one of the best indications of true intent and should be given great, if not controlling, influence.'" *Solar Motors, Inc. v. First Nat'l Bank of Chadron, 545 N.W.2d 714, 722 (Neb. 1996)* (quoting *Nowak v. Burke Energy Corp., 418 N.W.2d 236, 241-42 (Neb. 1998)*); *Dunn v. Mutual Ben. Health & Acc. Ass'n, 282 N.W. 487, 489 (Neb. 1938)* (interpretation given by the parties while performing the contract, "before any controversy has arisen, is one of the best indications of their true intent and meaning, and the courts should ordinarily enforce such construction" (internal quotation marks and citation omitted)).

Further,

> A court is not free to rewrite a contract or to speculate as to terms of the contract which the parties have not seen fit to include. And a contract is viewed as a whole in order to construe it. Whatever the construction of a particular clause of a contract, standing alone, may be, it must be read in connection with other clauses, and all writings forming part of the same transaction are interpreted together.

*Davenport Ltd. Partnership*, 780 N.W.2d at 423 (footnotes omitted).

The language of the documents that were part of the parties' contract, Midwest's knowledge of IAA's multiple lots prior to entry into the parties' contract,

and the parties' performance during the term of the contract establish that the contract required Midwest to request, and IAA to give, explicit approval for towing services characterized as "two stops," "second stops," "added stops," or "additional stops," as well as the associated charges therefor, in order for Midwest to receive reimbursement for towing vehicles to lots other than IAA's 52nd Street lot. Without such authorization, Midwest was required to absorb the cost.

The Towing Rate Sheet, which was part of the parties' Towing Services Agreement, provided that "IAA will pay $25.00 for *additional stops*, *if approved* by the Branch Manager." (Emphasis added.) The TSA stated at ¶ 4.2 that "[a]ll additional charges such as *two stops*, waiting time, and dry runs *not authorized* by IAA will be absorbed by [Midwest] and not reimbursed by IAA." (Emphasis added.) Further, the TSA expressly stated at ¶ 14 that it "fully incorporates any and all terms, conditions, rights, obligations, covenants, promises of the like of the attached RFP," making the RFP documents part of the contract. (Trial Ex. 101.) Midwest's "Responses to Request for Proposal: IAA Omaha" indicate that Midwest was not only aware of not-covered or additional fees, but it expressly understood that "as long as any additional fees are approved by the Omaha branch manager, they will be paid but, if they are not *approved prior to performance* they can and may be denied." (Trial Ex. 115 (emphasis added).)

The evidence presented at trial makes clear that prior to execution of the contract, Midwest understood that IAA's Omaha branch consisted of multiple lots and that it would be required to make deliveries to these lots, and Midwest negotiated the contract consistent with this understanding. Furthermore, during contract negotiations and immediately after execution of the contract, Midwest acknowledged in writing that it understood IAA's policies and procedures with respect to approval and payment of additional charges. Additionally, Midwest knew how to and, in fact, did request approval and invoice IAA for some two-stop charges under the contract, and such charges were approved and paid accordingly.

From March 8, 2010, until early 2011, Midwest never protested or complained to IAA regarding the delivery of vehicles to lots other than the 52nd Street lot; Midwest did not request approval or invoice IAA for delivery to outlying lots; and Midwest never sent a notice of breach to IAA, indicating the parties' belief that base towing rates were the only compensation due under the contract. When Midwest finally approached IAA branch management in early 2011, IAA unequivocally denied Midwest's requests for additional compensation. Yet Midwest continued to tow; it continued to deliver to IAA's 36th and 60th Street lots; it never presented IAA with any invoices requesting approval for additional charges; and it rejected the opportunity to renegotiate its contract via the RFP process. Moreover, Midwest continued towing despite its ability to terminate the contract either (1) upon 30 days written notice of nonperformance giving IAA 15 days to cure or (2) without cause upon 90 days notice. (Trial Ex. 101,Towing Services Agreement ¶ 13.)

Therefore, IAA did not breach the parties' contract when it did not reimburse Midwest for towing vehicles to lots other than IAA's 52nd Street lot and bringing associated paperwork to 52nd Street because Midwest did not comply with the condition precedent that activated IAA's duty to pay—that is, Midwest did not seek IAA's express approval for those services as "two stops," "second stops," "added stops," or "additional stops," as well as the associated charges therefor. Because Midwest has failed to prove compliance with the condition precedent that activated the defendant's duty, it has failed to prove a breach. *Phipps,* 610 N.W.2d at 730 ("In order to recover in an action for breach of contract, the plaintiff must plead and prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that activate the defendant's duty.").

**Modification of Contract**

It could be argued that Midwest attempted to modify the parties' existing contract when it finally requested additional compensation in 2011. In July 2010, IAA directed that all State Farm vehicles were to be towed to IAA's 36th Street lot.

Midwest did not object to this request until early 2011, when Midwest demanded additional compensation because it claimed it was not previously aware that deliveries of vehicles on a single load to the 36th and 60th Street lots—lots it had been delivering to since the beginning of the contract—warranted two-stop charges.

Midwest's request for additional compensation was essentially an attempted oral modification of the contract in order to receive extra compensation for work it had already agreed to do and for which it had already been paid base towing rates. Besides the fact that the parties' agreement provided that it "may only be modified or amended in writing duly signed by both parties" (Trial Ex. 101 ¶ 14), "[m]utual assent by the parties is required to modify a contract that substantially changes the liabilities of the parties." Solar Motors, 545 N.W.2d at 721 (citations omitted). "Moreover, the silence of a contracting party to a proposed modification leaves the contract unmodified." Id.[4]

IAA did not assent to Midwest's proposed modification, either orally or in writing. Instead, Dawn Kors rejected the attempted contract modification by (1) explicitly and plainly refusing to pay the additional compensation requested and (2) offering Midwest the opportunity to renegotiate the contract through a new RFP process, which Midwest refused. IAA "went beyond mere silence as to any response to a proposed modification" and "explicitly expressed its intention to not modify" the parties' existing agreement. Solar Motors, 545 N.W.2d at 721. Therefore, the parties' contract was not modified.[5]

---

[4]Whether this no-oral-modification clause is enforceable is irrelevant because (1) if it is enforceable, there is no evidence of a written modification; and (2) if it is not enforceable, there is no evidence of mutual assent to an oral modification.

[5]To the extent one could argue that IAA's directive in July 2010 to tow all State Farm vehicles to IAA's 36th Street lot was an attempted modification of the parties' contract, it is undisputed that Midwest continued to comply with this directive without complaint until 2011. Midwest's silence would have left the contract unmodified.

## **Early Termination**

While not noted in the Order on Final Pretrial Conference as an unresolved issue (Filing 120), there was testimony at trial related to the possibility that IAA breached the parties' contract by providing a 29-day notice of termination, instead of a 30-day notice, as stated in the contract. Even if true, Midwest is still not entitled to damages for lost profits. Where, as here, a contract contains a provision allowing termination without cause upon due notice, but a party terminates without allowing the notice period to expire, damages are limited to those that could potentially accrue during the period of required notice. *Children's Broadcasting Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1019 n.4 (8th Cir. 2001).

On June 28, 2013, IAA provided written notice to Midwest that the contract would terminate effective July 27, 2013, which was one day short of the contractual notice period. However, Midwest did not incur any damages for early termination because the parties have agreed as an "uncontroverted fact" that Midwest performed its "last tow under the parties' contract on or about July 26, 2013." (Filing 120, at CM/ECF p. 3.) Therefore, no damages would have accrued during the period of required notice.[6]

Accordingly,

IT IS ORDERED that judgment shall be entered by separate document in favor of defendant Insurance Auto Auctions, Inc., and against plaintiff Jackson Harmon

---

*Solar Motors*, 545 N.W.2d at 721 (citations omitted).

[6]Because I have concluded that IAA did not breach the parties' contract, I need not address the issues of whether Midwest waived its right to recover second-stop fees or whether Midwest's claim for breach of contract is barred by laches, unclean hands, or estoppel.

Enterprises, LLC, d/b/a Midwest Towing, providing that the plaintiff shall take nothing.

DATED this 1st day of May, 2015.

                                                BY THE COURT:
                                                *Richard G. Kopf*
                                                Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.